**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**FLORENCE DIVISION**

| | | |
|---|---|---|
| **RUSSELL GEISSLER**, **BERNARD BAGLEY, AND WILLIE JAMES JACKSON**, *individually and on behalf of others similarly situated*, | ) ) ) ) | Case No.: 4:17-cv-01746-MBS |
| Plaintiffs, | ) ) ) | |
| vs. | ) ) | **PROPOSED** |
| **BRYAN P. STIRLING**, Director of the South Carolina Department of Corrections (SCDC), *in his official capacity*; and **JOHN B. MCREE, M.D.**, Division Director of Health and Professional Services for SCDC, *in his individual capacity*, | ) ) ) ) ) ) ) | **CONSENT DECREE FOR CHRONIC HEPATITIS C TREATMENT** |
| Defendants. | ) ) ) | |

1

# **TABLE OF CONTENTS**

I.    INTRODUCTION ........................................................................................................... 1

II.   CASE HISTORY ........................................................................................................... 3

III.  PARTIES ...................................................................................................................... 5

IV.   DEFINITIONS .............................................................................................................. 5

    A.    Class Definitions .................................................................................................. 5

    B.    Other Definitions ................................................................................................. 5

V.    SPECIFIC TERMS OF TREATMENT CONSENT DECREE ........................................ 7

    A.    Funding................................................................................................................. 7

    B.    Treatment Prioritization ...................................................................................... 7

    C.    Treatment ............................................................................................................. 8

    D.    Monitoring and Progress Reports........................................................................ 10

VI.   GENERAL TERMS....................................................................................................... 12

    A.    Court to Retain Jurisdiction................................................................................. 12

    B.    Procedure for Dispute Resolution ....................................................................... 12

    C.    Access to Relevant Documents ............................................................................ 13

    D.    Notice of Treatment Consent Decree and Training ............................................. 14

    E.    Objections To Treatment Consent Decree ........................................................... 14

    F.    Scope of Consent Decree...................................................................................... 14

    G.    Incorporation of Testing Agreement (ECF No. 166-1)......................................... 15

    H.    Attorney's Fees and Costs .................................................................................... 16

VII.  SIGNATURES ............................................................................................................... 16

INDEX OF EXHIBITS
    A) Testing Agreement
    B) Acuity Levels
    C) Hepatitis C Virus (HCV) Educational Pamphlet

## I.  INTRODUCTION

1.  Hepatitis C ("HCV") is a blood-borne virus that causes liver infection, among other things.  Today, most people become infected with HCV by sharing needles or other equipment to inject drugs. For some people, HCV is a short-term illness, but for 70%–85% of people who become infected with HCV, it becomes a long-term, chronic infection. Chronic HCV is a serious disease than can result in life-long health problems, even death. The majority of infected persons might not be aware of their infection because they are not clinically ill.[1]

2.  This Court and the Parties recognize the need to test inmates of the South Carolina Department of Corrections ("SCDC") for HCV and to provide treatment to those inmates who have the disease.  Such a commitment is necessary to: (a) treat inmates diagnosed with HCV with Medication that substantially increases the chances of the diagnosed inmate being cured of HCV; (b) significantly reduce the spread of HCV among the SCDC inmate population; and (c) significantly reduce the spread of HCV among the general population of South Carolina as inmates are released from incarceration.

3.  Accordingly, Plaintiffs Russell Geissler and Willie James Jackson (the "Treatment Class Representatives") and Defendant Bryan Stirling in his official capacity as Director of SCDC (collectively, the "Parties") have entered into this Proposed Consent Decree For Chronic Hepatitis C Treatment (the "Treatment Consent Decree"), which resolves, subject to Court approval, all claims for injunctive and declaratory relief

---

[1] See, https://www.cdc.gov/hepatitis/hcv/index.htm

regarding, and practices related to, treating inmates for Chronic HCV (the "Treatment Claims").

4. The Treatment Consent Decree is entered into for the purpose of identifying and treating a disease at its earliest stages before the costs associated with treating a specific diagnosed individual increases exponentially.

5. In accordance with 18 U.S.C. § 3626(a)(1)(A) & (c)(1) of the Prison Litigation Reform Act (the "PLRA"), the Parties stipulate and the Court finds that the Treatment Consent Decree is narrowly drawn, extends no further than necessary to correct the alleged violation of a Federal right, and is the least intrusive means necessary to prevent a violation of a Federal right. SCDC has reviewed the Treatment Consent Decree and sought advice of counsel and agrees that it meets the requirements of the PLRA. SCDC agrees that it will not seek to terminate or otherwise challenge the Treatment Consent Decree based on a contention that it is inconsistent with the Prison Litigation Reform Act.

6. The Parties agree that the issues and remedies established by this Treatment Consent Decree are appropriate for certification as a class action pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure. Specifically, the Parties agree that (1) the class of present and future SCDC inmates is too numerous to make joinder practicable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of Plaintiffs Geissler and Jackson are typical of the claims or defenses of the class; and (4) Plaintiffs Geissler and Jackson will fairly and adequately protect the interests of the class. Accordingly, the Parties stipulate and the Court finds that class certification of all current and future inmates in SCDC custody is warranted.

7. The Treatment Consent Decree is the product of arms-length negotiations. It is substantively fair and reasonable and is in the best interests of the Treatment Class and the public.

8. The Court and all parties to this Treatment Consent Decree acknowledge that SCDC's agreement (through its Director) to be bound by the obligations set forth herein shall not be construed as an admission of liability or the violation of any alleged Federal right and SCDC specifically denies that it or any of its employees and/or agents have violated any alleged Federal right of the named Plaintiffs or any other SCDC inmates.

## II.    CASE HISTORY

9. An initial Complaint in this matter was filed *pro se* by Plaintiff Russell Geissler on June 30, 2017, seeking, among other things, (1) treatment for his Chronic HCV and (2) treatment for all SCDC inmates with Chronic HCV. (ECF No. 1 at 6). The Court appointed Christopher Bryant of Yarborough Applegate to be counsel for Plaintiff Geissler on January 9, 2018, in light of "the state of the law regarding the issue." (ECF No. 72 at 2).

10. The Parties were unable to negotiate a settlement for Plaintiff Geissler's individual claims, and appointed counsel associated additional counsel and filed the Second Amended Class Complaint. (ECF No. 88). Reuben Guttman, Caroline Poplin, JD/MD, Elizabeth Shofner, Paul Zwier, and (later) Nancy Gertner of Guttman, Buschner & Brooks LLP, subsequently entered the litigation with Mr. Bryant as putative class counsel. The Third Amended Class Action Complaint, adding Willie James Jackson and Bernard Bagley as class representatives, was filed on August 21, 2018. (ECF No. 108).

11. The Parties engaged in discovery including document production, interrogatories, and depositions.  Depositions were taken of Samuel Soltis (former SCDC Assistant Deputy Director of Health Services), Wendy Knox (SCDC Director of Pharmacy Services), Melanie Davis (SCDC Infection Control Manager), Bryan Stirling (SCDC Director), Linda Wooten (SCDC Supervisor of Specialty Clinics), and John McRee (SCDC Medical Director).

12. On November 12, 2018, the Parties filed a stipulation as to class certification of the Testing Class.  (ECF No. 125).  Plaintiffs Geissler and Bernard Bagley are the proposed representatives for the Testing Class. (*Id*.).   The Court So Ordered the stipulation on December 12, 2018. (ECF No. 140).

13. The Parties subsequently resolved the Testing Claims.  On December 19, 2018, the Court preliminarily approved a Revised Partial Consent Decree and the form of notice (the "Notice") to be provided to the Testing Class. (ECF No. 142).

14. On February 12, 2019, the court held a hearing on the appointment of class counsel and appointed the aforementioned attorneys to be Class Counsel. (ECF No. 156).

15. On July 22, 2019 the Parties resubmitted to this Court their Joint Motion for Final Approval of the Parties' Proposed Partial Settlement Agreement pertaining to the Testing Claims, (ECF No. 166), to clarify their requested relief to be approval of a partial settlement agreement, rather than the entry of a consent decree, on the issue of testing.  The Parties' settlement agreement was approved by Order of this Court on August 5, 2019.  (ECF No. 168).

16. Now, through this Treatment Consent Decree, the Parties seek to incorporate the terms of the Proposed Partial Settlement Agreement on testing so that this Treatment Consent Decree encompasses, *inter alia*, testing, treatment, and education as set forth below.

## III.    PARTIES

17. This Treatment Consent Decree benefits a class represented by Plaintiffs Russell Geissler and Willie James Jackson, and binds Defendant Bryan P. Stirling in his official capacity as Director of SCDC.  Plaintiff Bernard Bagley and Defendant John B. McRee, M.D. are not Parties to this Treatment Consent Decree.

## IV.    DEFINITIONS

### A.    Class Definitions

18. The "Testing Class" refers to all current and future inmates in SCDC custody with the exception of inmates who have already been diagnosed with Chronic HCV.

19. The "Treatment Class" refers to all current and future inmates in SCDC custody who have been or will be diagnosed with Chronic HCV.

### B.    Other Definitions

20. "Acuity Level" shall be defined by the terms of Exhibit B hereto.

21. "Chronic HCV" refers to the diagnosis of anyone tested for HCV who is determined to have a positive viral load that is not considered by the diagnosing physician to be acute HCV.

22. "Counseling" shall include education regarding transmission, treatment, and prevention of HCV.

23.  "DAA" refers to direct-acting antiviral medications.

24. "Defendant Bryan P. Stirling" shall also include his successor or the individual or individuals acting in the capacity of Director of SCDC or fulfilling the functions of SCDC Director.

25. "Effective Date" shall be the date upon which this Treatment Consent Decree is entered by the Court or a motion to enter the Treatment Consent Decree is granted, whichever occurs first, as recorded on the Court's docket.

26. "HCV" refers to the Hepatitis C virus.

27. "Medical Monitoring" shall mean monitoring as appropriate for each Acuity Level and treatment phase, as established by the American Association for the Study of Liver Diseases (AASLD) and the Infectious Diseases Society of America (IDSA) in their joint HCV Guidance: Recommendations for Testing, Managing, and Treating Hepatitis C, which is updated periodically and available at https://www.hcvguidelines.org/.

28. "Medication" shall mean a "DAA" medication that creates a sustained virologic response to HCV.

29. "Physician" shall mean a physician licensed to practice in South Carolina who is board-certified in infectious diseases or gastroenterology.

30. "Preliminary Approval Date" refers to the date on which the Court enters an order preliminarily approving this Treatment Consent Decree and directing that notice of pendency and settlement be provided to Plaintiffs.

31. "R & E" shall mean SCDC's "Reception and Evaluation" intake process for new SCDC inmates.

32. "Sustained virologic response" shall mean an undetectable HCV viral load.

33. "Testing Agreement" refers to the Proposed Partial Settlement Agreement which was approved by the Court on August 5, 2019 (ECF No. 168).

34. "Treatment Consent Decree" refers to this decree concerning the treatment of inmates who have Chronic HCV along with all of the exhibits referenced in the decree.

## V.    SPECIFIC TERMS OF TREATMENT CONSENT DECREE

### A.    Funding

35. SCDC has sought funding and the South Carolina Legislature has agreed to provide $10 million to SCDC for the 2019–2020 Fiscal Year specifically for the purpose of HCV testing and treatment.  While not guaranteed, SCDC has a good faith basis for believing additional funding in the same amount will be approved for recurring fiscal years and SCDC agrees to take steps to continue to request this funding over the next four (4) fiscal years and beyond to the extent necessary to comply with the terms of this Treatment Consent Decree.

### B.    Treatment Prioritization

36. All inmates at SCDC shall be offered testing for HCV as required by Exhibit A, which is fully incorporated into this Treatment Consent Decree.

37.  Inmates who test positive for Chronic HCV shall be ranked on a scale of 1-3 according to the severity of their illness by factors identified in Exhibit B hereto.  These rankings shall be known as "Acuity Levels." The determination of an Acuity Level shall be based solely on medical need and under no circumstances shall monetary constraints, length of term of incarceration, or inmate conduct be a factor in determining the Acuity Level of an inmate afflicted with Chronic HCV.  Where prioritizing the order of treatment is necessary, Acuity Levels shall be used to establish priority of treatment with level one given the highest priority and level three given the lowest priority.

## C.     Treatment

38. From the date of SCDC's execution of this Treatment Consent Decree until April 22, 2022 at the latest, SCDC agrees to treat those inmates diagnosed with Chronic HCV who agree to be treated as follows:

a.     any inmate known to SCDC on October 15, 2019, as having been diagnosed with Chronic HCV with an Acuity Level 1 shall begin treatment, including Medication, no later than April 15, 2020, provided said inmate has at least six (6) months[2] remaining on his or her sentence at the time treatment begins;

b.     any inmate diagnosed with Chronic HCV after October 15, 2019, but prior to April 22, 2022, with an Acuity Level 1 shall begin treatment, including Medication, no later than 180 days after diagnosis, provided said inmate has at least six (6) months remaining on his or her sentence at the time treatment begins;

c.     any inmate known to SCDC on October 15, 2019, as having been diagnosed with Chronic HCV with an Acuity Level OTHER THAN 1 shall begin treatment, including Medication, no later than July 22, 2021, provided said inmate has at least six (6) months remaining on his or her sentence at the time treatment begins;

d.     any inmate diagnosed with Chronic HCV after October 15, 2019, but prior to April 22, 2022, with an Acuity Level OTHER THAN 1 shall begin treatment no

---

[2] Given the uncertainty of calculating the exact time remaining on a prison sentence, the period of six months remaining on an inmate's sentence was selected to ensure that the inmate remains in the SCDC system long enough to complete a drug regimen, which must be uninterrupted and properly monitored, and necessary follow-up.

later than April 22, 2022, provided said inmate has at least six (6) months remaining on his or her sentence at the time treatment begins.

e. any inmate who does not have at least six (6) months remaining on his or her sentence at the time treatment could begin will be provided discharge planning and a link to a resource for treatment upon release;

f. in the event the above deadlines cannot be met for any inmate due to circumstances beyond SCDC's control, SCDC shall apply to the Monitor for an exception and will treat said inmate as soon as medically feasible;

g. treatment shall be conducted in order of Acuity Level or medical necessity, as determined by SCDC Physicians;

h. the decision of whether treatment is appropriate for any diagnosed inmate shall be based on an individualized assessment and medical feasibility—as determined and documented by an SCDC Physician—without consideration of the availability of funding, length of sentence, or the nature of the inmate's conduct or crimes.

39. By April 22, 2022 at the latest, and continuing thereafter, every SCDC inmate diagnosed with Chronic HCV at the time of admission to SCDC will be offered treatment for HCV within 120 days of diagnosis, provided said inmate has at least six (6) months remaining on his or her sentence at the time treatment begins.

40. By April 22, 2022 at the latest, and continuing thereafter, every SCDC inmate diagnosed with Chronic HCV after clearing Reception & Evaluation will be offered treatment within 120 days of diagnosis, provided said inmate has at least six (6) months remaining on his or her sentence at the time treatment begins.

41. Treatment offered shall include, but not be limited to, Medication, counseling, and medical monitoring and shall at least meet the most current standards of medical care as specified in, inter alia, the AASLD and the IDSA joint HCV Guidance: Recommendations for Testing, Managing, and Treating Hepatitis C, which is updated periodically and available at ***https://www.hcvguidelines.org/.***

42. In addition, SCDC will immediately initiate education efforts to teach all inmates who have been diagnosed with HCV how to deal with their disease while awaiting treatment and during the pendency of treatment.  The parameters of this program are set forth in Exhibit C hereto.

43. SCDC will also immediately initiate both educational and procedural efforts to prevent inmates who have been diagnosed with Chronic HCV from receiving any medications that may be contraindicated for such patients.

44. For any diagnosed inmate whose length of sentence makes treatment medically unfeasible, SCDC shall provide information regarding various treatment options that are available upon release.

**D.**     **Monitoring and Progress Reports**

45. Magistrate Judge Mary Gordon Baker ("the Monitor") shall monitor implementation of this Treatment Consent Decree, facilitate the resolution of any disputes under the Treatment Consent Decree, and report non-compliance with obligations of this Treatment Consent Decree to the Court.

46. With respect to the role of the Monitor and the Parties' obligations and rights, SCDC shall file reports with the Monitor and Class Counsel on a quarterly basis for the first twelve (12) months following the Effective Date and every six (6) months thereafter (subject to approval by the Monitor) that shall ***include*** the following:

a) The number of inmates who have tested positive for HCV (viral load);

b) The number of inmates who have not been tested;

c) The number of inmates who have tested positive for Chronic HCV, broken down by Acuity Level;

d) The number of inmates who have commenced treatment for Chronic HCV, broken down by Acuity Level;

e) The number of inmates who have completed treatment for Chronic HCV and achieved a sustained virologic response, broken down by Acuity Level;

f) The number of inmates who have completed treatment for HCV and have not achieved a sustained virologic response, broken down by Acuity Level;

g) The inmate number of each untreated Chronic HCV inmate with the individual's specific date of diagnosis, Acuity Level, and release date;

h) Other information deemed reasonably necessary by the Monitor, in her discretion, to satisfy her obligations under this Treatment Consent Decree, including the names of any inmates awaiting treatment. The Monitor may request and have access to the HCV Patient Database at any date or time for review of testing and treatment status verification.

i) No less than quarterly through April 22, 2022, the Parties shall meet with the Monitor in person or by telephone or video conference. At the discretion of the Monitor or the request of the Parties, these conferences may take place at different intervals.

j) The Monitor and Class Counsel will receive and review this documentation. The Monitor will also have the authority to independently follow up with the Director of

SCDC through its counsel regarding any issues related to this Treatment Consent

Decree.

## VI.    GENERAL TERMS

### A.    Court to Retain Jurisdiction

47. The Court shall retain jurisdiction to enforce the terms of this Treatment Consent

Decree, including the authority to enforce compliance with the terms of the Treatment

Consent Decree with its contempt powers or reinstate the underlying action (*Geissler v.*

*Stirling*, Case No.: 4:17-cv-01746-MBS) for purposes of proceeding to trial.

### B.    Procedure for Dispute Resolution

48. With regard to any disputes involving implementation of this Treatment Consent

Decree, Class Counsel and counsel for the Defendant shall make a reasonable effort to

resolve any issue in controversy through negotiation.

49. Notice of any such dispute or any other Notice or Report required by this Treatment

Consent Decree shall be sent by overnight carrier to the following:

**For Plaintiffs:**

James M. Griffin, Fed ID 1053
jgriffin@griffindavislaw.com
GRIFFIN | DAVIS
4408 Forest Drive, Suite 300
P.O. Box 999 (29202)
Columbia, S.C. 29206

Reuben A. Guttman
rguttman@gbblegal.com
Elizabeth H. Shofner
lshofner@gbblegal.com
GUTTMAN, BUSCHNER & BROOKS PLLC
2000 P Street, NW, Suite 300
Washington, D.C. 20036
(202) 800-3001

**For Defendants:**

Samuel F. Arthur III, Federal ID 7070
sfa@aikenbridges.com
J. Rufus Bratton III, Federal ID 10332
PO Drawer 1931
Florence, SC 29503
Telephone: 843.669.8787
Fax: 843.664.0097

**For the Monitor:**

Hon. Mary Gordon Baker
baker_ecf@scd.uscourts.gov
85 Broad Street
Charleston SC 29401

50. If the Parties are unable to resolve any issues through negotiation, they will submit their dispute to the Monitor for mediation.

51. If the Parties are unable to resolve the controversy through mediation, any dispute shall be submitted to the Court for a hearing on the issues.  Following the hearing, the Court may either (a) make a binding disposition of the disputed issue, or (2) reinstate the underlying action (*Geissler v. Stirling*, Case No.: 4:17-cv-01746-MBS) for purposes of proceeding to trial.  This Treatment Consent Decree shall not be modified in any way absent Court approval.

**C.    Access to Relevant Documents**

52. As set forth in this Treatment Consent Decree, SCDC shall provide Magistrate Judge Mary Gordon Baker with access to all documents necessary and relevant to the implementation of this Treatment Consent Decree in a manner consistent with HIPAA's protections regarding Protected Health Information.

**D.    Notice of Treatment Consent Decree and Training**

53. In furtherance of his obligation to provide strict compliance with the terms of this Treatment Consent Decree, Defendant Stirling shall, within ***ten (10)*** days of preliminary approval, distribute this Treatment Consent Decree to all SCDC agents, servants, representatives, and employees who will be involved with implementing this Treatment Consent Decree.

54. To ensure understanding of the obligations established by this Treatment Consent Decree, Director Stirling or his successor shall – in addition to distributing the Treatment Consent Decree – provide training on the obligations established by the Treatment Consent Decree to all individuals who will be implementing the Treatment Consent Decree.

55. Notice of this Treatment Consent Decree shall be conspicuously posted throughout every SCDC housing unit within ten (10) days of the Preliminary Approval Date.

**E.    Objections To Treatment Consent Decree**

56. Individual Class Members who are currently incarcerated in SCDC institutions shall have the right to submit written objections to this Treatment Consent Decree to the Court within 45 days of the Preliminary Approval Date of this Treatment Consent Decree or under such alternative terms and conditions as may be allowed by the Court.

**F.    Scope of Consent Decree**

57. This Treatment Consent Decree shall be deemed to serve as a resolution only of claims for declaratory and injunctive relief concerning SCDC's HCV treatment policies and practices (contained in Counts I–III of the Third Amended Class Action Complaint). This Treatment Consent Decree does not affect the right of any Class Member or other individual to pursue claims for monetary relief.  If an individual or Class Member seeks

14

declaratory or injunctive relief in a separate action, he or she may do so only so long as such lawsuit does not pertain to the HCV treatment issues addressed in this Treatment Consent Decree.

58. The Parties agree that this Treatment Consent Decree establishes minimum standards only and is not intended to prevent Defendant Bryan Stirling from implementing any programs or processes that further protect the healthcare and safety of Class Members. In addition, this Treatment Consent Decree is not intended to and shall not have the effect of decreasing or abrogating the rights, programs, and procedures that existed before this Treatment Consent Decree pursuant to SCDC's policies, procedures, or other lawsuit settlements.  Further, this Treatment Consent Decree does not abrogate any substantive rights or procedural protections  Class Members may now have or hereafter acquire under state or federal statutes or common law.

59. The Parties agree that this Treatment Consent Decree, including its exhibits, represents the entire  agreement of the Parties and shall not be modified except as allowed  by this Treatment Consent Decree.

## G.    Incorporation of Testing Agreement (ECF No. 166-1)

60. The terms of the Proposed Partial Settlement Agreement (ECF No. 166-1) (the "Testing Agreement"), which was approved by the Court on August 5, 2019 (ECF No. 168), are hereby incorporated by reference and made a part of this Treatment Consent Decree as if fully set forth herein.  The Court, having already retained jurisdiction over the Testing Agreement, will continue in its authority to enforce compliance with the terms of the Testing Agreement or reinstate the underlying action (*Geissler v. Stirling*, Case No.: 4:17-cv-01746-MBS) for purposes of proceeding to trial.

### H.    Attorney's Fees and Costs

61. Defendants acknowledge that Plaintiffs intend to seek reasonable attorneys' fees and costs in an amount, manner, and time period approved by the Court pursuant to Federal Rule of Civil Procedure 23(h).  Class Counsel intends to file a motion pursuant to Federal Rule of Civil Procedure 54(d)(2) to request the Court's approval of such fees and costs.  With respect to Class Counsel's continuing obligation to monitor this Consent Decree, Plaintiffs reserve the right to seek further attorneys' fees and costs as warranted.  Notwithstanding the above, the Parties shall endeavor to resolve matters of fees and costs absent Court involvement and shall utilize the Monitor to do so.

## VII.    SIGNATURES

The following Parties certify that they have read the foregoing Treatment Consent Decree and that it is an accurate record of their agreement in this action:

**GRIFFIN | DAVIS**

s/ James M. Griffin
James M. Griffin, Fed Id 1053
jgriffin@griffindavislaw.com
4408 Forest Drive, Suite 300
P.O. Box 999 (29202)
Columbia, S.C. 29206
(803) 744-0800

**GUTTMAN, BUSCHNER & BROOKS PLLC**

Reuben A. Guttman*
rguttman@gbblegal.com
Justin S. Brooks*
jbrooks@gbblegal.com
Nancy Gertner
ngertner@gbblegal.com
Caroline Poplin*
cpoplin@gbblegal.com
Elizabeth H. Shofner*
lshofner@gbblegal.com

**AIKEN, BRIDGES, ELLIOTT, TYLER & SALEEBY, P.A.**

s/ Samuel F. Arthur, III
Samuel F. Arthur III, Federal ID 7070
sfa@aikenbridges.com
J. Rufus Bratton III, Federal ID 10332
jrb@aikenbridges.com
PO Drawer 1931
Florence, SC 29503
(843) 669-8787

*ATTORNEYS FOR DEFENDANT*

Paul Zwier
pzwier@gbblegal.com
2000 P Street, NW, Suite 300
Washington, D.C. 20036
(202) 800-3001

**PERKINS COIE LLP**

s/ Christopher J. Bryant
Christopher J. Bryant, Federal ID 12538
cbryant@perkinscoie.com
Robert A. Burgoyne**
rburgoyne@perkinscoie.com
700 Thirteenth Street, N.W., Suite 600
Washington, D.C. 20005-3960
(202) 654-6200

*ATTORNEYS FOR PLAINTIFFS*

\* Admitted *pro hac vice*
\*\* application for *pro hac vice* forthcoming



**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION**

| | | |
|---|---|---|
| RUSSELL GEISSLER, BERNARD BAGLEY, AND WILLIE JAMES JACKSON, *individually and on behalf of others similarly situated*, | ) ) ) ) ) | Case No.: 4:17-cv-01746-MBS |
| Plaintiffs, | ) ) ) | |
| vs. | ) ) | **PROPOSED PARTIAL SETTLEMENT AGREEMENT** |
| BRYAN P. STIRLING, Director of the South Carolina Department of Corrections (SCDC), *in his official capacity*; and JOHN B. MCREE, M.D., Division Director of Health and Professional Services for SCDC, *in his individual capacity*, | ) ) ) ) ) ) ) | **(Testing for Chronic Hepatitis C)** |
| Defendants. | ) ) ) | |

## CONTENTS

PARTIES AND DEFINITIONS ................................................................. 2

GENERAL PRINCIPLES ......................................................................... 3

SPECIFIC TERMS OF SETTLEMENT ................................................... 8

    A.    Implement the Centers for Disease Control's (CDC's) Recommended Two-Step Process for Diagnosing Chronic HCV .................................. 8

    B.    Test Plaintiffs Geissler and Bagley for Chronic HCV According to CDC Guidelines.... 8

    C.    Expeditiously Determine the Scope of Chronic HCV within SCDC............................. 9

    D.    Provide the Governor and the Legislature with Scope and Cost Estimates ................. 10

    E.    Complete Two-Step Testing for Inmates who have Already Tested positive for HCV Antibodies ................................................................. 11

    F.    Provide Opt-Out Testing for New Inmates ...................................................... 11

    G.    Provide Opt-Out Testing for All Inmates......................................................... 11

    H.    Establish and Maintain Accurate Electronic Database of Inmates with Chronic HCV . 12

    I.    Report Progress Every Four Months.................................................................. 12

SIGNATURES .................................................................................... 13

## PARTIES AND DEFINITIONS

1.     The parties to this Proposed Partial Settlement Agreement (the "Testing Agreement") are Plaintiffs Russell Geissler and Bernard Bagley, individually and on behalf of others similarly situated; and Defendant Bryan P. Stirling, in his official capacity as Director of the South Carolina Department of Corrections ("SCDC").  Plaintiff Willie James Jackson and Defendant John B. McRee, M.D. are not Parties to this Testing Agreement.

2.     "HCV" refers to Hepatitis C.

3.     "DAA" refers to direct-acting antiviral medications.

4.     "Plaintiffs" refers to all current and future inmates in SCDC custody, with the exception of inmates who have already been diagnosed with chronic HCV.

5.     "Governor" refers to the current Governor of South Carolina, and, if applicable, any Governor-elect.

6.     "Legislature" refers to the individual members of the South Carolina House and Senate who hold office on January 8, 2019.

7.     "Opt-Out Testing" refers to the process of informing a patient of the indications of HCV and the plan for testing and performing the tests, unless the patient declines them.  It is an informed refusal rather than informed consent.

8.     "Preliminary Approval Date" refers to December 20, 2018, the date on which the Court entered an order preliminarily approving the Stipulation of Settlement and directing that notice of pendency and settlement be provided to Plaintiffs (Dkt. 142).

9.     "Effective Date" shall be the date upon which the Testing Agreement is approved by the Court or a motion to approve the Testing Agreement is granted, whichever occurs first, as recorded on the Court's docket.

# GENERAL PRINCIPLES

10.     For any plans discussed in this Testing Agreement, the parties shall make a reasonable effort to resolve any issue in controversy through negotiation.  If the parties are unable to resolve any issues through negotiation, they will submit their dispute to Magistrate Judge Mary Gordon Baker for mediation.  If the parties are unable to resolve the controversy through this process the plan shall be submitted to the Court for a hearing on the issues.

11.     The Court shall retain full jurisdiction in this case to enforce the terms of the Testing Agreement and to ensure that all plans incorporated herein are fully complied with and implemented.

12.     Counsel for Plaintiffs Geissler and Bagley shall have access to and may receive copies of documents that effectuate the implementation of the Testing Agreement in a manner consistent with HIPAA's protections regarding Protected Health Information.

13.     Defendant Stirling, in his official capacity as Director of SCDC, shall immediately explain the terms of the Testing Agreement and distribute it to all SCDC agents, servants, representatives, and employees who will be involved with effectuating the Testing Agreement to ensure their understanding of the need for compliance therewith.  Defendant Stirling shall require strict compliance with the Testing Agreement by said persons.

14.     Notice of this Testing Agreement shall be provided as follows:

   a.  The Testing Agreement shall be posted in each and every housing unit of every SCDC Institution;

   b.  The Testing Agreement shall be available on the SCDC website and in prison libraries;

   c.  The Testing Agreement shall be posted on the website www.SCHepC.com;

   d.  The Testing Agreement shall be distributed to the Circuit Public Defender for each judicial circuit in South Carolina;

    e.   The Testing Agreement shall be distributed to the South Carolina Bar;

    f.   Each Inmate—upon being processed—shall be advised of the existence of the Testing Agreement and where it is available to review and told specifically that: "by Court Order you have a right to be tested for Hepatitis C pursuant to the terms of the Testing Agreement. This means that you have the right to be tested for the Hepatitis C anti-body. If that test is positive, you have the right to a second test called a sensitive HCV-RNA test to confirm the presence of the Hepatitis C virus."

15.    Plaintiffs who are currently incarcerated in SCDC institutions shall have the right to individually submit written objections to the Testing Agreement to the Court within 45 days of the Preliminary Approval Date of the Testing Agreement or under such alternative terms and conditions as may be required by the Court.

16.    The Testing Agreement shall be deemed to serve as settlement of claims for declaratory and injunctive relief concerning SCDC's HCV testing policies and practices (contained in Count I of the Third Amended Class Action Complaint).  The Testing Agreement does not address the claims for declaratory and injunctive relief concerning SCDC's HCV treatment policies and practices (Counts I–III of the Third Amended Class Action Complaint). The Testing Agreement does not affect the right of an individual to pursue individual claims for monetary relief.  If a Plaintiff seeks declaratory or injunctive relief in a separate action, he or she may do so as long as such lawsuit does not pertain to the HCV testing issues addressed in the Testing Agreement.

17.    Strict compliance with the Testing Agreement shall be a complete defense to any equitable claim based upon the HCV testing issues addressed in the Testing Agreement. However, all parties acknowledge the Testing Agreement shall not resolve any issues involving the treatment of chronic HCV. Nonetheless, the parties are committed to reaching a complete resolution that will include treatment and, hence, the parties reserve the right to seek to have the

Testing Agreement incorporated into a final consent order that resolves all matters before the Court in this case.

18.     Any timetable proposed in the Testing Agreement may be subject to extension by written agreement of the Parties or by the Court upon a showing of reasonable grounds for such extension by Defendant Stirling, so long as the need for delay is not caused by the neglect or dereliction or inaction of Defendant Stirling, or any person who replaces Defendant Stirling as Director of SCDC.  Plaintiffs reserve the right to object in good faith and oppose any requests for extensions of time.

19.     In the event of an emergency that Defendant Stirling in good faith believes to require the temporary waiver of the provisions of the Testing Agreement, Defendant Stirling shall notify the Court and Plaintiffs' counsel of the emergency and need for waiver within 24 hours of knowledge that said emergency will impact SCDC's ability to comply with the requirements of the Testing Agreement.  Such notice shall identify the emergency, the specific provisions of the Testing Agreement that Defendant Stirling believes must be temporarily waived, the reasons necessitating the waiver, the exhaustion of all alternatives to waiver, and the anticipated duration of the waiver.  If Plaintiffs' counsel have a good faith disagreement with the proposed waiver or its duration, the controversy shall be submitted to the Court for hearing and determination.

20.     The parties agree that the Testing Agreement establishes minimum standards and is not intended to prevent Defendant Bryan Stirling from implementing any programs or processes that benefit Plaintiffs.  In addition, the Testing Agreement is not intended to and shall not have the effect of decreasing or abrogating the rights, programs, and procedures that existed before the Testing Agreement pursuant to SCDC's policies, procedures, or other lawsuit

settlements. Further, the Testing Agreement does not abrogate any substantive rights or procedural protections Plaintiffs may now have or hereafter acquire under state or federal statutes. The parties agree that the Testing Agreement represents the entire intent of the parties and shall not be modified except as expressly permitted within the Testing Agreement. Defendant Stirling shall carry out every provision of the Testing Agreement in good faith.

21.     All parties agree that the chronic HCV testing issue in this action is appropriate for certification as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure. The parties have stipulated to the certification of a class action, as it pertains to testing for chronic HCV, pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure, composed of all current and future inmates in SCDC custody, with the exception of inmates who have already been diagnosed with chronic HCV.

22.     The parties expressly agree that the Testing Agreement is not an admission of constitutional violations. The parties have entered into the Testing Agreement solely as a means to reasonably resolve part of the controversy and to avoid the costs, time and risks which litigation would involve for both parties. The Testing Agreement should not be construed in any manner as establishing constitutional standards, minimums, maximums, or thresholds of constitutional harm to Plaintiffs. Neither the Testing Agreement nor the Judgment that may follow from the Testing Agreement, nor anything contained herein or therein, shall constitute or be construed as evidence or as an admission or adjudication with respect to any alleged fact or conclusion of law with respect to any matter alleged in or arising out of the Third Amended Complaint, including but not limited to any alleged constitutional violations asserted by Plaintiffs, or of any wrongdoing or misconduct on the part of Defendant Stirling.

23.     The Testing Agreement is enforceable by Plaintiffs and the Court.

24.     Violation of the Testing Agreement shall not serve as the basis of liability of Defendant Stirling to any individual Plaintiff, absent proof of proximate cause and damages.

25.     The Testing Agreement may be modified in the future by mutual and joint petition of the parties or their successors, or upon petition of any party.  Said petition shall be made to the Court and approved by the Court, after notice and hearing, by an Order amending the Testing Agreement. Any disputed petition for modification shall be reviewed by the Court under the applicable law pertaining to the modification of settlement agreements approved by the Court.

26.     No remedial action, including sanctions, shall be taken against Defendant Stirling or any of his agents, representatives, or employees in their individual capacities for any alleged failure to comply with the Testing Agreement unless the Court specifically finds, following a hearing, that said individual acted in bad faith.  For the purposes of this paragraph, an individual shall not be deemed to have acted in bad faith if budgetary constraints are the reason for his or her failure to satisfy the terms of the Testing Agreement, so long as he or she has made good-faith efforts to obtain the necessary funding from all potential sources.  For the purposes of this paragraph, good-faith efforts must include informing the Governor and the Legislature of the anticipated need and the anticipated shortfall in writing within 10 days of identifying the budgetary constraints.

27.     Because the Testing Agreement is only a partial resolution of the pending controversy and additional litigation is ongoing, Plaintiffs' counsel reserve the right to seek at a later date all costs and reasonable attorneys' fees incurred to date in connection with the Testing Agreement that are available by law.

## SPECIFIC TERMS OF SETTLEMENT

**A.    Implement the Centers for Disease Control's (CDC's) Recommended Two-Step Process for Diagnosing Chronic HCV**

28.    Since May 2013, the CDC has specified that testing for chronic HCV should be done in a two-step process to confirm chronic HCV.  In the first step, it is determined whether the HCV antibody is present.  If the HCV antibody is present, the second step is to determine whether the HCV infection is current by conducting nucleic acid testing (NAT).  (See https://www.hcvguidelines.org).

29.    Accurate testing will help SCDC (a) correctly identify persons with chronic HCV; (b) notify inmates with chronic HCV of their status and enable SCDC and the inmates themselves to take measures to limit HCV disease progression; and (c) inform inmates who do not have HCV of their status.

30.    Defendant Stirling agrees to implement this two-step testing process immediately upon the filing of the Testing Agreement to be carried out in the manner set forth in more detail herein.  As of the Preliminary Approval Date, SCDC will use the two-step process to diagnose chronic HCV.  SCDC will administer LabCorp test number 144050 identified as Hepatitis C Virus (HCV) Antibody With Reflex To Quantitative Real-Time PCR.

31.    Defendant Stirling also agrees to incorporate this two-step process into all SCDC policies, procedures, and protocols involving the initial diagnosis of chronic HCV for as long as it remains the generally accepted standard of care.

**B.    Test Plaintiffs Geissler and Bagley for Chronic HCV According to CDC Guidelines**

32.    Within 21 days of the Preliminary Approval Date, Defendant Stirling agrees to test Plaintiffs Geissler and Bagley for chronic HCV according to CDC guidelines.  Defendant

Stirling shall provide these plaintiffs and their counsel with the results of these tests as soon as they are known.

**C.    Expeditiously Determine the Scope of Chronic HCV within SCDC**

33.    At present, there is no accurate count or reasoned estimate of the size of the population of SCDC inmates that have chronic HCV.  The size of that population will determine, in part, the manner in which the treatment component of this action progresses.  To quickly and accurately estimate the scope of chronic HCV within SCDC, Defendant Stirling agrees to provide Opt-Out Testing to a randomly selected sample of 390 inmates (130 inmates at a level 3 facility (Perry Correctional Institution); 130 inmates at a level 2 facility (Turbeville Correctional Institution); 65 inmates from a level 1 facility (Manning Correctional Institution); and 65 inmates at a female facility (Camille Griffin Graham Correctional Institution)) within 30 days of the Preliminary Approval Date.  Decisions on which housing units at these institutions the inmates are selected from will be based on adequate security considerations. In case of unforeseen circumstances, such as weather, extended lockdown, staffing shortages, or any other reason for good cause, Defendant Stirling shall notify the Court and Plaintiffs' counsel of the unforeseen circumstances and an extension not to exceed 30 days shall be given to accomplish the testing.  It is acknowledged by all parties to this Decree that the population from which the sample group is selected may include individuals who have been diagnosed with chronic HCV, as well as individuals who have tested positive for the HCV antibody.

34.    Defendant Stirling agrees to provide Plaintiffs' counsel and the Court with the following information regarding the randomly selected inmates tested for chronic HCV (in a manner consistent with HIPAA's protections regarding Protected Health Information) within 5 days of finishing the random Opt-Out Testing of the 390 inmates:

- Total number of inmates offered Opt-Out Testing

- Total number of inmates that opted out

- Total number of inmates administered HCV antibody tests

- Total number of HCV-antibody positive inmates

- Total number of inmates with chronic HCV

35.    Defendant Stirling agrees to provide Plaintiffs' counsel with copies of the test results and opt-out forms so that they can be confirmed within 5 days of finishing the random Opt-Out Testing of the 390 inmates. For purposes of this Consent Decree,  the random Opt-Out Testing is not finished until such time as Defendant Stirling is in possession of all test results from Lab Corp. and all opt-out forms.

36.    This section shall not be subject to mediation.

**D.    Provide the Governor and the Legislature with Scope and Cost Estimates**

37.    Within 45 days of the Preliminary Approval Date, Defendant Stirling agrees to provide to the Governor a memorandum containing, at a minimum, (1) the number of SCDC inmates who have been randomly tested for chronic HCV, (2) the estimated number of SCDC inmates with chronic HCV based on the random sample that was tested, and (3) the estimated cost of DAA medications for those inmates.  In the event that Defendant Stirling has not completed the testing of the randomly selected inmates within 45 days of the Preliminary Approval Date, Defendant Stirling will update the memorandum when testing is completed with any changes to (1) the estimated number of SCDC inmates with chronic HCV based on the random sample that was tested, and (2) the estimated cost of DAA medications for those inmates.

38.    At Defendant Stirling's discretion, a revision to SCDC's Fiscal Year 2019–2020 budget plan may be submitted to the Governor.

39.     On or before January 10, 2019, Defendant Stirling agrees to provide to the Legislature a memorandum containing, at a minimum, (1) the estimated number of SCDC inmates with chronic HCV based on the random sample that was tested, and (2) the estimated cost of DAA medications for those inmates.

**E.    Complete Two-Step Testing for Inmates who have Already Tested positive for HCV Antibodies**

40.     As of April 12, 2018, 616 SCDC inmates tested positive for the HCV antibody. Most of those inmates have not received nucleic acid testing to confirm that they actually have chronic HCV.

41.     Defendant Stirling agrees to complete two-step testing for all of these inmates who have not received nucleic acid testing within 8 months of the Preliminary Approval Date, unless an earlier timeline is established elsewhere in the Testing Agreement.

**F.    Provide Opt-Out Testing for New Inmates**

42.     Defendant Stirling agrees to incorporate Opt-Out Testing for new inmate intake in SCDC policies, procedures, protocols, and practices within 4 months of the Preliminary Approval Date.

43.     Within 5 months of the Preliminary Approval Date, 100% of new SCDC inmates who do not already have a confirmed HCV diagnosis will be offered Opt-Out Testing.

**G.    Provide Opt-Out Testing for All Inmates**

44.     Within 6 months of the Preliminary Approval Date, Defendant Stirling agrees to develop a plan to provide Opt-Out Testing to all SCDC inmates.

45.     Defendant Stirling agrees to provide Opt-Out Testing to 100% of all SCDC inmates within 18 months of the Preliminary Approval Date.

**H.    Establish and Maintain Accurate Electronic Database of Inmates with Chronic HCV**

46.    Within 3 months of the Preliminary Approval Date, Defendant Stirling agrees to establish an electronic system to readily identify SCDC inmates who have been diagnosed with chronic HCV.

47.    At a minimum, this system shall include the following information:  Inmate number; date of HCV antibody test; date of nucleic acid test; Highest APRI score to date; and Treatment Status.

**I.    Report Progress Every Four Months**

48.    Unless a different reporting date is established elsewhere in the Testing Agreement, Defendant Stirling will provide updates every four months from the Effective Date regarding progress in the following:

a.    Number of inmates who have been offered Opt-Out Testing to date

b.    Number of inmates who have opted out of HCV testing to date

c.    Number of inmates administered HCV antibody tests through the opt-out program to date

d.    Number of inmates HCV-antibody positive who have not yet confirmed chronic HCV with nucleic acid test, separating into two groups (the Opt-Out Group, and the inmates who had already known that they were HCV antibody positive)

e.    Number of inmates to date who have a confirmed chronic HCV diagnosis.

49.    With respect to Sections A and E, Defendant Stirling shall provide Judge Mary Gordon Baker and Plaintiffs' counsel with supporting documentation, where appropriate, indicating for each subsection whether Defendant is in compliance.

50.    Magistrate Judge Mary Gordon Baker will receive and review this documentation and have the authority to independently follow up with Defendant Stirling on any issues related to the Testing Agreement.

# SIGNATURES

The following parties certify that they have read the foregoing Testing Agreement and

that it is an accurate record of their agreement in this action:

**YARBOROUGH APPLEGATE LLC**

s/ Christopher J. Bryant
David B. Yarborough Jr., Federal ID 7336
david@yarboroughapplegate.com
Christopher J. Bryant, Federal ID 12538
chris@yarboroughapplegate.com
291 East Bay Street, Floor 2
Charleston, SC 29401
(843) 972-0150 office
(843) 277-6691 fax

**GUTTMAN, BUSCHNER & BROOKS PLLC**

s/ Reuben A. Guttman
Reuben A. Guttman*
rguttman@gbblegal.com
Justin S. Brooks*
jbrooks@gbblegal.com
Paul J. Zwier II*
pzweir@gbblegal.com
Elizabeth Shofner*
lshofner@gbblegal.com
2000 P Street, NW
Suite 300
Washington, D.C. 20036
(202) 800-3001 office

*ATTORNEYS FOR PLAINTIFFS*

**AIKEN, BRIDGES, ELLIOTT, TYLER & SALEEBY, P.A.**

s/Samuel F. Arthur, III
Samuel F. Arthur III, Federal ID 7070
sfa@aikenbridges.com
J. Rufus Bratton III, Federal ID 10332
PO Drawer 1931
Florence, SC 29503
Telephone: 843.669.8787
Fax: 843.664.0097

*ATTORNEYS FOR DEFENDANT*

November 28, 2018

*         admitted *pro hac vice*

B

## ACUITY LEVELS

Pursuant to Paragraph 20 of the Treatment Consent Decree, the following criteria establish the basis for determining "acuity levels."  Relying on the criteria below, acuity levels shall be determined by a "Physician," as that word is defined in Paragraph 29 of the Treatment Consent Decree.

## Acuity Level 1

- Advanced Hepatic Fibrosis
  - **APRI > 2.0, or**
  - Metavir or Batts/Ludwig stage 3 or 4 on liver biopsy, or
  - Known or suspected **cirrhosis** - This includes cases of known cirrhosis or clinical findings consistent with cirrhosis, or
  - FibroScan score of >12.5 kPa
- Liver Transplant candidates or recipients. Other types of transplant candidates or recipients may be appropriate for Acuity Level 1 and shall be considered individually on a case by case basis.
- **Hepatocellular carcinoma (HCC)** - At least one third of all cases of HCC occur in association with HCV infection, with most cases occurring in those with advanced fibrosis or cirrhosis. Treatment shall be determined on an individual basis by the Physician.
- Comorbid Medical Conditions Associated with HCV, including:
  - Cryoglobulinemia with renal disease or vasculitis
  - Certain types of lymphomas or hematologic malignancies
  - Porphyria cutanea tarda
- Immunosuppressant Medication for a Comorbid Medical Condition
  - some immunosuppressant medications (e.g., certain chemotherapy agents and tumor necrosisfactor inhibitors) may be needed to treat a comorbid medical condition, but are not recommended for use when infection is present. Acuity Level 1 shall be considered on an individual basis.
- Continuity of care for those already started on treatment, including inmates who are newly incarcerated in SCDC. Inmates who may have had a voluntary or involuntary break in treatment or shall be evaluated on a case-by-case basis by the Physician.

## Acuity Level 2

- Evidence for Progressive Fibrosis
  - APRI score >2 0.7
  - FibroScan Score >9-12.5 kPa

- COMORBID MEDICAL CONDITIONS associated with more rapid progression of fibrosis
  - Coinfection with HBV or HIV
  - Comorbid liver diseases (e.g., autoimmune hepatitis, hemochromatosis, fatty infiltration of the liver, steatohepatitis)

- - Diabetes mellitus
- Chronic Kidney Disease (CKD) with GFR ≤ 59 mL/min per 1.73 m2
- Birth cohort 1945–1965
- Women of reproductive age

**Acuity Level 3**

- APRI score <0.7
- FibroScan score <9 kPa
- All other cases of Chronic HCV infection, as defined in the Treatment Consent Decree.

**In addition to meeting the above criteria for Acuity Levels 1-3, inmates being considered for treatment of HCV infection should:**

- Have no contraindications to, or significant drug interactions with, any component of treatment regimen.
- Not be pregnant.
- Have sufficient time remaining on their sentence in SCDC to complete treatment and have their post-12-week SVR completed.
  - Inmates with high priority for treatment but insufficient time remaining to serve within the SCDC, may be considered for treatment if they will have access to medications and health care providers for continuity of care at the time of release.
- Have a life expectancy > 18 months.

C

# Hepatitis C Virus (HCV):
# What You Should Know

## What is Hepatitis C?

Hepatitis C is a liver infection caused by the hepatitis C virus. Hepatitis C can range from a mild illness lasting a few weeks to a serious, lifelong illness. Hepatitis C is often described as "acute," meaning a new infection or "chronic," meaning lifelong infection.

- **Acute hepatitis C** occurs within the first 6 months after someone is exposed to the hepatitis C virus. Hepatitis C can be a short-term illness, but for most people, acute infection leads to chronic infection.
- **Chronic hepatitis C** can be a lifelong infection with the hepatitis C virus if left untreated. Left untreated, chronic Hepatitis C can cause serious health problems, including liver damage, cirrhosis (scarring of the liver), liver cancer, and even death.

## Is it possible to clear the hepatitis C virus?

Yes, approximately 15%-25% of people who are infected with the hepatitis C virus clear it from their bodies without treatment and do not develop chronic infection. Experts do not fully understand why this happens for some people.

## How is hepatitis C spread?

Hepatitis C is usually spread when blood from a person infected with hepatitis C virus enters the body of someone who is not infected. Today, most people become infected with the hepatitis C virus by sharing needles or other equipment to inject drugs.

People can become infected with the hepatitis C virus during such activities as:

- Sharing needles, syringes, or other equipment to prepare or inject drugs
- Needle-stick injuries in health care settings
- Born to a mother who has hepatitis C

Less commonly, a person can also get hepatitis C virus through:

- Sharing personal care items that may have come in contact with another person's blood, such as razors or toothbrushes
- Having sexual contact with a person infected with the hepatitis C virus
- Getting a tattoo or body piercing in an unregulated setting

Hepatitis C virus is not spread by sharing eating utensils, breastfeeding, hugging, kissing, holding hands, coughing, or sneezing. It is also not spread through food or water.

## Can I be re-infected with hepatitis C if I have cleared the virus?

Yes, whether you have been infected with the hepatitis C virus and cleared the virus, or you have been successfully treated.

## Can hepatitis C virus be spread through sexual contact?

Yes, but the risk of transmission from sexual contact is believed to be low. The risk increases for people who have multiple sex partners, have a sexually transmitted disease, engage in rough sex, or are infected with HIV.

## Can you get hepatitis C by getting a tattoo or piercing?

A few major research studies have not shown hepatitis C to be spread through licensed, commercial tattooing facilities. However, transmission of hepatitis C (and other infectious diseases) is possible when poor infection-control practices are used during tattooing or piercing. Unregulated tattooing and piercing are known to occur in prisons and other informal settings and may put a person at risk of infection.

## Can a person get hepatitis C virus from a mosquito or other insect bite?

No, the hepatitis C virus has not been shown to be transmitted by mosquitos or other insects.

# Symptoms

## What are the symptoms of acute hepatitis C?

People with new (acute) hepatitis C infection usually <u>do not have symptoms</u>, or have mild symptoms. When symptoms do occur, they can include:

- Fever
- Fatigue
- Dark urine
- Clay-colored bowel movement
- Abdominal pain
- Loss of appetite
- Nausea
- Vomiting
- Joint pain
- Jaundice (yellow color in the skin or eyes)

## How soon after exposure to hepatitis C virus do symptoms appear?

In those people who develop symptoms from acute infection, the average time from exposure to symptoms ranges from 2 to 12 weeks. However, most people who are infected with the hepatitis C virus <u>do not develop symptoms.</u>

## Can a person spread hepatitis C without having symptoms?

Yes, even if a person with hepatitis C has no symptoms, he or she can still spread the hepatitis C virus to others.

## Is it possible to have hepatitis C and not know it?

Yes, many people who are infected with the hepatitis C virus do not know they are infected because <u>they do not look or feel sick.</u>

## What are the symptoms of chronic hepatitis C?

Most people with chronic hepatitis C virus infection <u>do not have any symptoms</u>, or have general or common symptoms such as chronic fatigue and depression. Many people who eventually develop chronic liver disease, which can range from mild to severe, including cirrhosis (scarring of the liver) and liver cancer. Chronic liver disease in people with hepatitis C <u>usually happens slowly,</u> without any signs or symptoms, over several <u>decades.</u>

## How serious is chronic hepatitis C?

Chronic hepatitis C can be a serious disease resulting in <u>long-term</u> health problems, including liver damage, liver failure, liver cancer, or even death. It is a major cause of cirrhosis and liver cancer and the most common reason for liver transplantation in the United States.

## What are the long-term effects of hepatitis C?

Of every 100 people infected with hepatitis C virus:

- 75-85 will develop chronic infection
- 10-20 will develop cirrhosis over 20-30 years

Among 100 people with hepatitis C and cirrhosis, with each passing year:

- 3-6 will develop liver failure
- 1-5 will develop liver cancer

Developing cirrhosis is more likely if you are male, age 50 years and older, use alcohol, have nonalcoholic fatty liver disease, hepatitis B virus or HIV coinfection, or take immunosuppressive drugs.

## What blood tests are used to test for Hepatitis C?

The only way to know if you have hepatitis C is to get tested and you may need more than one type of test. A blood test, called a hepatitis C antibody (or "anti-HCV") test, can tell if you have ever been infected with the hepatitis C virus. Antibodies are chemicals released into the bloodstream when someone gets infected. Another test, called a hepatitis C virus RNA test, can tell if you have a current infection with the hepatitis C virus. RNA is the virus's genetic material.

## How do I interpret the results of hepatitis C antibody test?

There are two possible antibody test results:

- **Non-reactive, or a <u>negative</u>**, means that a person has never had hepatitis C. However, if a person has been recently exposed to the hepatitis C virus, he or she should be tested again in 6-12 months.
- **Reactive, or a <u>positive</u>,** means that hepatitis C antibodies were found in the blood and a person has been infected with hepatitis C at some point in time. A reactive antibody test does not necessarily mean a person has hepatitis C. Once someone has been infected, they will always have antibodies in their blood. This is true even if they have cleared the hepatitis C virus,

## How soon after exposure to the hepatitis C virus can the antibody test tell if someone is infected?

For most people exposed to the hepatitis C virus, the HCV antibody test will be positive in 4-10 weeks. About 97% of people infected will have a positive HCV antibody test 6 months after exposure.

## How soon after exposure to the hepatitis C virus can hepatitis C virus be detected by a hepatitis C virus RNA (PCR) test?

The hepatitis C virus RNA test (or PCR) can tell a person is infected in 2-3 weeks after exposure.

## Can a person have a normal liver enzyme (e.g., ALT) level and still have hepatitis C?

Yes. It is common for persons with chronic hepatitis C to have a liver enzyme level that goes up and down, with periodic returns to normal or near normal. Some people with hepatitis C have liver enzyme levels that are normal for over a year even though they have chronic liver disease.

## Can a person be infected with HIV and the hepatitis C virus?

Yes, a person can be infected with both HIV and the hepatitis C virus. This is sometimes called "coinfection."

# Treatment

## What is the treatment for acute hepatitis C?

There is not a recommended treatment for acute hepatitis C. People with acute hepatitis C virus infection should be followed by a doctor and only considered for treatment if their infection remains and becomes a chronic infection.

## What is the treatment for chronic hepatitis C?

There are several medications available to treat chronic hepatitis C. Hepatitis C treatments have gotten much better in recent years. Current treatment usually involve just 8-12 weeks of oral therapy (pills) and cure over 90% of people with few side effects. For those being treated for hepatitis C, it is important to follow the medical instructions given by your doctor. If you are given oral therapy, it is essential that you take the medication as instructed and not miss a dose.

## What can a person with chronic hepatitis C do to take care of his or her liver?

First, people with chronic hepatitis C should talk to their doctor about treatments, even if they have been treated for hepatitis C in the past. For people with cirrhosis, there is a continued risk of liver cancer, even after Hepatitis C virus infection is cured. People with chronic hepatitis C, and people with cirrhosis (even if they have been cured for hepatitis C) should be monitored regularly by a doctor and be vaccinated against hepatitis A and B. People with chronic hepatitis C should avoid alcohol because it can cause additional liver damage. They should also check with their doctor before taking any prescription pills, herbs, supplements, or over-the-counter medications, as these can potentially damage the liver.

*Information taken from the U.S. Centers for Disease Control and Prevention*

https://www.cdc.gov/hepatitis/hcv/cfaq.htm